UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
UNITED STATES OF AMERICA,

v.                                                                            **OPINION AND ORDER**

JAMAUL AZIZ,                                                         7:21-cr-00113-01 (PMH)

                     Defendant.
-----------------------------------------------------------X

PHILIP M. HALPERN, United States District Judge:

      Jamaul Aziz ("Mr. Aziz" or "Defendant") stands charged in a three-count indictment of: (1) conspiracy to distribute narcotics in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)—(C), and 846; (2) possession of a firearm in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (ii); and (3) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (Doc. 110).

      Presently pending before the Court is Mr. Aziz's motion made pursuant to Federal Rule of Criminal Procedure 12(b)(3) to suppress: (1) all physical evidence taken from Defendant and his automobile, and (2) all statements made by Defendant to law enforcement agents on January 7, 2021, including all evidence obtained derivatively as fruits of the allegedly illegal stop, search and interrogation. (Doc. 103; Doc. 104; Doc. 106). The Government opposed the motion to suppress (Doc. 173),[1] and Defendant filed reply papers (Doc. 174). The Government thereafter, with the Court's permission, filed sur-reply. (Doc. 175). Defendant argues that he was stopped without cause, subjected to a roadside cavity search, and questioned by law enforcement after invoking his right to remain silent. His motion seeks to suppress evidence recovered during the stop—including a bag of fentanyl found on his person—and the entirety of his post-arrest statement.

---

[1] The Government also submitted with its opposition an audio file marked as Exhibit A ("Ex. A").

Because an affidavit was submitted with the Government's sur-reply (*see* Doc. 175 at 4-7, "Ranno Aff.") to which Defendant had not had an opportunity to respond, and in light of what appeared to be differing accounts of the search at issue, the Court held an evidentiary hearing, but limited in scope to two discrete issues. (Doc. 194; Doc. 208, "Tr.").[2] The Government called to the stand FBI Special Agent Christopher Serotta, New York State Police Investigator Corey Ranno, and New York State Trooper Michael Sleyzak. Mr. Aziz elected to testify in his behalf as well. The Court reserved decision on the motion and permitted counsel to file supplemental post-hearing briefing. Defendant filed his letter-brief on February 22, 2024 (Doc. 206) and the Government filed its response on February 29, 2024 (Doc. 209).

Based upon the parties' written submissions, the testimony adduced at the evidentiary hearing, and for the reasons set forth below, Defendant's motion is DENIED.

## **BACKGROUND**

A Confidential Informant ("CI"), in October 2020, told members of the FBI's Hudson Valley Safe Streets Task Force that Defendant was selling narcotics in and around Monticello, New York. (Doc. 1, "Compl." ¶ 6). Between October 2020 and December 2020, the CI, at the direction of law enforcement, made four controlled purchases of fentanyl from Defendant, totaling approximately 76 grams. (*Id*. ¶ 10(a)-(d)). The CI arranged each of these purchases directly with Defendant. (*Id*.).

---

[2] "[A]n evidentiary hearing on a motion to suppress ordinarily is required if the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Cantoni*, No. 19-4358-CR, 2022 WL 211211, at *3 (2d Cir. Jan. 25, 2022) (quoting *United States v. Watson*, 404 F.3d 163, 167 (2d Cir. 2005) (alteration in original)). In other words, a hearing concerning the nature and extent of the briefing that Investigator Ranno was given, if any, and the manner in which the Defendant was searched incident to arrest, was necessary in this case only to the extent there were "contested issues of fact that must be resolved in order for this Court to rule on [the] motion to suppress." *United States v. Holt*, No. 21-CR-00080, 2021 WL 5281366, at *2 (D. Conn. Nov. 12, 2021); *see also United States v. Merced*, No. 19-CR-00832, 2021 WL 5647827, at *11 (S.D.N.Y. Nov. 30, 2021).

Agent Serotta testified that the FBI also conducted surveillance of Defendant, including monitoring location data from his phone. (Tr. at 8:4-24). During this surveillance, agents observed the phone registering in the area of a particular residence on Ohm Avenue in the Bronx, which had been associated with Defendant through prior law enforcement reports. (*Id*.). Based on, among other things, Defendant's pattern of travel to Sullivan County and his repeated drug sales there, law enforcement suspected that Defendant was transporting narcotics for distribution from New York City to Sullivan County. (*Id*. at 4:25-5:4). Accordingly, in late December 2020 or early January 2021, the FBI decided to arrest Defendant. (*Id*. at 5:13-17).

In early January 2021 and in Monticello, New York, the FBI briefed other members of the FBI's Hudson Valley Safe Streets Task Force (the "Task Force"), the New York State Police, and local law enforcement in Sullivan County about the investigation, the nature of the case against Mr. Aziz, and the plan to arrest him. (*Id*. at 6:4-18; 24:18-24). Agent Serotta and Investigator Ranno credibly testified about the pre-arrest briefing, in particular the agencies present, the discussion topics, the case against Mr. Aziz, the plan to conduct a traffic stop, and the directive to arrest Mr. Aziz regardless of whether he had drugs in his possession at the time of arrest. (*Id*. at 5:9-6:18; 6:24-25, 7:9-8:3, 10:11, 12:10-13, 15:1-6, 22:10-23, 24:23-25:17, 42:1-2). Trooper Sleyzak also credibly testified that his team's task was to arrest Defendant during the traffic stop based upon his prior drug sales regardless of whether Mr. Aziz was in possession of narcotics at the time of the arrest. (*Id*. at 58:3-24).

On January 7, 2021, Agent Serotta conducted surveillance in the area of Ohm Avenue which was believed to be Mr. Aziz's residence. (*Id*. at 8:4-13). Agents, contemporaneously tracking the Defendant's location data, determined that he was likely in a Kia automobile they observed, and contacted other members of the Task Force, who set up surveillance at various

3

points on the route to Sullivan County. The Agents also contacted the New York State Troopers to prepare to stop the Kia. (*Id*. at 8:14-9:20, 17:25-18:8, 26:1-27:18, 30:9-31:1).

Investigator Ranno was stationed in the area of State Route 17 and had been notified by another member of law enforcement that Defendant was traveling to Sullivan and that his vehicle should be stopped by Troopers. (*Id*.). He observed the Kia traveling at 76 miles per hour in a 55 miles per hour zone and failing to maintain its designated lane. (*Id*. at 31:11-20). Investigator Ranno then pulled the Kia over and asked the driver for his license and registration. (*Id*. at 31:23-32:19). Investigator Ranno detected the odor of raw vegetative marijuana emanating from within the vehicle. (*Id*. at 33:3-7). The driver and sole occupant of the Kia identified himself as Mr. Aziz, and provided a South Carolina license bearing his name. (*Id*. at 33:14-23, 45:4-8). At that point, Investigator Ranno positively identified the driver of the Kia as Defendant.

Trooper Sleyzak joined Investigator Ranno to assist with the stop. (*Id*. at 34:23-35:2, 60:8-21). Trooper Sleyzak walked around the Kia to ensure that there were no other occupants in the vehicle and, while doing so, also smelled marijuana emanating from the Kia. (*Id*. at 60:22-61:4).

Investigator Ranno then initiated a search of Defendant. (*Id*. at 34:23-35:21). Investigator Ranno, Trooper Sleyzak, and Mr. Aziz each testified about the circumstances surrounding the search. Investigator Ranno, in sum and substance, testified that he "felt a bulge protruding from the natural curve of [Mr. Aziz's] body"—specifically, near Mr. Aziz's butt cheeks—which Investigator Ranno believed "was something that was unnatural." Tr. 36:10-18. Investigator Ranno then "shook [Mr. Aziz's] pants enough to cause that item to dislodge from his butt checks," and "[f]rom the outside of his pants, [Investigator Ranno] manipulated [the object] in a way to cause it to fall to the ground." (*Id*. at 36:23-36:15). Trooper Sleyzak testified that he

4

observed Investigator Ranno "locate[] an unknown object in Mr. Aziz's groin area" and then "guide that object from his groin down his pant leg," which eventually "fell on to the ground from the outside of his clothing." (*Id*. at 62:5-10). Mr. Aziz testified that he had what he believed to be heroin in a small black bag "stuffed inside of my butt cheeks," and that as part of the search, Investigator Ranno "kept . . . basically massaging it down, to get it from under my boxer briefs through to my . . . thermals." (*Id*. at 73:7-75:24). Mr. Aziz testified that the search was performed over his thermals, which were outside his underwear.³ (*Id*. at 87:18-89:2).

Upon retrieving the bag from Mr. Aziz's butt cheeks, a field test was performed which revealed the presence of fentanyl. (*Id*. at 37:24-38:5). Investigator Ranno also located a pill in Mr. Aziz's sock as well as a quantity of marijuana inside the vehicle. (*Id*. at 38:10-14). Mr. Aziz was placed in handcuffs, into a patrol vehicle, and transported by Trooper Joe Rodriguez to the local barracks. (*Id*. at 39:3-12).

After arriving at the local barracks, FBI Task Force Officer Travis Hartman and New York State Police Investigator Christopher William conducted a videotaped interview of Defendant. (*See* Ex. A). The officers asked for some general contact information and Defendant responded: "Before you ask me questions . . . you need to let me know what's going on." (*Id*. at 08:08-08:17). Officer Hartman agreed to "lay it all out there for" Defendant "to the fullest." (*Id*. at 09:05-09:11). After getting his contact information, Williams advised Defendant of his *Miranda* rights. (*Id*. at 10:15-10:37). Defendant confirmed he understood his rights. (*Id*. at 10:38). Williams asked: "Having these rights in mind do you wish to speak to us now?" to which Defendant responded "I didn't want, you said you was speaking to me. I didn't want to speak to

---

³ The affidavit that Mr. Aziz submitted initially in support of his motion, and which caused the Court to require a hearing in the first instance, told an entirely different story. The affidavit stated that "[a]t least four other officers where [sic] present . . . and my pants were pulled down and an officer put his fingers in my anus." (Doc. 104 ¶ 7).

5

nobody." (*Id*. at 10:38-10:49). Williams responded: "you can listen, that's fine." (*Id*. at 10:49-10:52). Thereafter, the officers revealed information that law enforcement had learned during their investigation.

After about 45 minutes, Hartman told Defendant that he was willing to listen if Defendant wanted to make a statement but could not waste the rest of his evening. (*Id*. at 14:50-15:00). In response, Defendant said he appreciated the officer's kindness to him, suggested that he could not make a statement with "no real understanding" of his circumstances, and ultimately said he wanted to "speak to a lawyer." (*Id*. at 15:00-15:33, 16:55-17:17). Hartman responded, "That's totally up to you." (*Id*. at 17:17-17:21). Defendant explained that he had "wanted to understand what was going on," and the officers observed that Defendant had been "fishing" for information, with Hartman admitting that he "fell for" Mr. Aziz's fishing. (*Id*. at 18:00-18:10). Defendant once again acknowledged Hartman's professionalism, saying "I appreciate you" and at that point the interview concluded. (*Id*. at 18:50-19:00). Indeed, the Court having watched the entirety of the videotape, Defendant made no statement of any kind other than as indicated; and certainly nothing that could be used against him.

## **ANALYSIS**

The Fourth Amendment provides, in pertinent part, that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. As that "text makes clear, the concept of reasonableness is the touchstone of constitutionality of a governmental search. What is reasonable, of course, depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself." *MacWade v. Kelly*, 460 F.3d 260, 267-68 (2d Cir. 2006).

A court's assessment as to whether probable cause existed at the time of the arrest is to be made on the basis of the collective knowledge of the police, rather than on that of the arresting officer alone. *Husbands ex rel. Forde v. City of New York*, 335 F. App'x 124, 127 (2d Cir. 2009)). It is settled that an officer may initiate a brief investigative stop of a vehicle when he or she has "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-418 (1981). Here, the credible evidence establishes that the officers had probable cause to stop the vehicle, and then search and arrest its sole occupant, based on information received in a briefing from other officers who were aware of controlled purchases of narcotics made by a confidential informant and from Defendant. *See United States v. Long*, 678 F. App'x 31, 33-34 (2d Cir. 2017). The credible testimony adduced at the evidentiary hearing establishes that the knowledge of the FBI agents investigating Defendant about his narcotics sales is properly imputed to the troopers who were briefed on the investigation and stopped the Kia. *See id.*; *Colon*, 250 F.3d at 135.

Separate and apart from the existence of probable cause based upon the prior controlled purchases of fentanyl from Defendant and the collective knowledge doctrine, the traffic violations observed by Investigator Ranno provided an independent basis for the stop. Courts have repeatedly found that, where an officer has probable cause that the occupant of a vehicle has committed a crime, the officer may stop the vehicle to effect that person's arrest. *Long*, 678 F. App'x at 33-34. And it is beyond cavil that officers may stop a vehicle where an officer has reasonable suspicion that a traffic violation occurred. *United States v. Stewart*, 551 F.3d 187, 191 (2d Cir. 2009). Speeding and failing to maintain a lane are traffic offenses for which a person can be detained or arrested, even if the traffic offense is a mere pretext for making the stop. N.Y. Veh. & Traf. Law §§ 155, 1180(b), 1125(c); *United States v. Dhinsa*, 171 F.3d 721, 724-25 (2d

Cir. 1998). Investigator Ranno credibly testified that Mr. Aziz had committed two traffic offenses for which he could be stopped and arrested.

Based upon the witnesses' credible, sworn statements, it is clear that probable cause existed to stop the vehicle and arrest Defendant. The officers were thus entitled to search him incident to arrest. *Colon*, 250 F.3d at 135.

With respect to Defendant's argument that the fentanyl should be suppressed because he was subjected to an unconstitutional roadside cavity search, the Government established, and Defendant's testimony confirmed, that he was not cavity-searched during the stop. The fentanyl found on his person was hidden in the area of his buttocks and recovered by sliding it down his pantleg between his pants and thermals. "[A] search incident to a lawfully executed arrest may still violate the Fourth Amendment, if conducted in an otherwise unreasonable manner." *Scalpi v. Amorim*, No. 14-CV-02126, 2018 WL 1606002, at *18 (S.D.N.Y. Mar. 29, 2018) (quoting *Wang v. Vahldieck*, No. 09-CV-03783, 2012 WL 119591, at *10 (E.D.N.Y. Jan. 9, 2012)); *see also Golden v. Cnty. of Westchester*, No. 10-CV-08933, 2012 WL 4327652, at *5 (S.D.N.Y. Sept. 18, 2012) ("'unreasonable, non-consensual, inappropriate touching' can constitute 'unreasonable intrusions into a plaintiff's bodily integrity in violation of the Fourth Amendment.'" (quoting *Fontana v. Raskin*, 262 F.3d 871, 880-81 (9th Cir. 2001))). In this case, however, the collective testimony of the arresting officers and Defendant himself establishes that the search was conducted over Plaintiff's thermals.

Under the circumstances, Investigator Ranno's search of Defendant was reasonable for purposes of the Fourth Amendment. *See, e.g., Scalpi*, 2018 WL 1606002, at *18 (over the clothing pat down of groin reasonable); *Golden*, 2012 WL 4327652, at *6 (pat down was a *de minimis* intrusion); *Friedman v. Young*, 702 F. Supp. 433, 438 (S.D.N.Y. 1988) ("Assuming his

pat-down included touching [the plaintiff's] genitalia while conducting the search, such conduct is not unreasonable in the absence of any showing of excessive force. His conduct was at all times reasonable."). The search does not therefore provide a basis to suppress the fentanyl recovered from Defendant's person.

Nor is there any basis to suppress the marijuana recovered from Defendant's vehicle. "The police may search an automobile and the containers within it where they have probable cause to believe contraband or evidence is contained." *California v. Acevedo*, 500 U.S. 565, 580 (1991); *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004) (under the automobile exception, law enforcement "may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime."). Here, as discussed above, the officers had been briefed on Mr. Aziz's prior narcotics trafficking activity, he was arrested for such activity, and law enforcement suspected that he was traveling from New York City to Sullivan County in the Kia in possession of narcotics. Thus, probable cause existed to search the Kia. In any event, the officers were independently justified in searching the car's center console for marijuana because of the credible testimony concerning the smell of marijuana emanating from the vehicle. *United States v. Faison*, 2015 WL 5915964, *5 (S.D.N.Y. Oct. 8, 2015).

With respect to suppression of Defendant's post-arrest statements, it is unclear to the Court what statements Defendant actually seeks to suppress that could be used against him. Defendant, in that regard, has not offered any specific statement he made during the interview that should be suppressed. Nonetheless, what is clear is that Defendant was properly advised of his *Miranda* rights and waived them knowingly and voluntarily, and did not unambiguously invoke his right to remain silent. The prosecution may not use, absent a warning, a statement

elicited by the police during a custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 448-50 (1966). Once the warning is properly administered, a defendant "is left to make his own choice as to how best to proceed." *United States v. Plugh*, 648 F.3d 118, 125 (2d Cir. 2011). If a defendant invokes his *Miranda* rights, all questioning must cease "unless the accused himself initiates further communication, exchanges, or conversations." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). A defendant must, however, unequivocally and unambiguously invoke the right to counsel. *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010).

This interaction is entirely on video. A review of the video reveals that after the *Miranda* warning was given, Mr. Aziz unequivocally confirmed that he understood the rights that were read to him and he then indicated that he wanted to hear what the officers had uncovered in their investigation of him. Defendant's argument is that the police "used deception" by telling him that he could just "listen" while continuing to ask him questions. But a review of the video shows that the officers did, in fact, permit Defendant to listen while they told him about various aspects of the FBI's investigation, including their knowledge of Defendant's street name, his residence, his whereabouts that day, and his interactions with co-conspirators. Defendant made no statements during such explanation by the officers. At the end of the interview, the officers remarked to Defendant that they knew he was "fishing" for information and that they "fell for it" by giving it to him. "*Miranda* forbids coercion, not mere strategic deception . . . . Ploys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins*, 496 U.S. 292, 297 (1990). Nothing incriminating was said by Defendant; and clearly Defendant

asked the officers to explain what they had learned about Defendant during their investigation. Nothing occurred during the video-taped interview that violated Defendant's rights.[4]

Accordingly, there is no basis to suppress Defendant's post-arrest statements.

## CONCLUSION

The motion to suppress is DENIED.

The Clerk of Court is respectfully directed to terminate the related pending motions: Doc. 167 (seeking reinstatement of Doc. 103), Doc. 199 (counsel's request for electronic devices order), and Doc. 204 (counsel's request to extend the supplemental briefing schedule), each of which was previously granted.

**SO ORDERED.**

Dated: White Plains, New York
       March 27, 2024

_____
Philip M. Halpern
United States District Judge

---

[4] Like his affidavit concerning the roadside search, Defendant's affidavit in this regard painted an entirely different picture. Defendant stated in his affidavit that "they persisted in asking me questions and told me 'the only thing you can do now is help yourself out, you can't get yourself in any more trouble.' I felt constrained to answer their questions even if some of my answers were untrue." (Doc. 104 ¶¶ 15-16).